PROPERTY ONE, INC.

VERSUS

USAGENCIES, L.L.C., ET AL.

CIVIL ACTION

NO. 11-453-JJB-SCR

**RULING ON MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

The matters before the court are a motion to dismiss (Doc. 5) and motion for summary judgment (Doc. 6) filed by defendants, USAgencies, L.L.C. ("USAgencies") and Affirmative Insurance Holdings, Inc. ("Affirmative"), against plaintiff Property Once, Inc. ("Property One"), as well as defendants' motion to strike declarations made by Property One in its opposition to summary judgment (Docs. 12-2 and 12-3). There is no need for oral argument. Jurisdiction based on diversity of citizenship exists under 28 U.S.C. § 1332.

This cases arises because of defendants'[1] failure to pay Property One real estate brokerage commissions it alleges are owed based on brokerage services provided to defendants in obtaining a tenant—the federal government—for a building USAgencies owns. Property One asserts three theories of liability: (1) defendants owe it the industry standard commission of 4% of the gross lease amount, with 50% due at signing and 50% due at lease commencement; (2) defendants were unjustly enriched through Property One's expenditure of time, effort and resources in helping secure the lease; and (3) Property One detrimentally relied on the representations of defendants.

---

[1] Affirmative, via its purchase of USAgencies effective January 1, 2007, is the sole member of USAgencies, L.L.C. (Killacky Affidavit, Doc. 1-2, Ex. A).

1

## I. Facts

The following facts are taken as true based on Property One's complaint. Affirmative is an integrated insurance holding company that acquired USAgencies in January 2007. Both companies provide auto insurance to consumers. USAgencies owns a building in Baton Rouge commonly called Renaissance Park. On August 31, 2005, the General Services Administration ("GSA"), a branch of the federal government, leased the building from USAgencies on behalf of the Federal Emergency Management Agency ("FEMA") ("the initial FEMA lease"). Property One, via its employee Macon Callicott, rendered services which helped to consummate that lease, earning it a portion of the leasing commission. As the FEMA lease came close to expiration, Affirmative asked Property One to help it obtain an extension of FEMA's lease by contacting GSA representatives with whom Property One had an existing relationship. Property One began negotiating to develop a new lease between USAgencies and GSA.

On or about October 8, 2008, Callicott attended a meeting in Fort Worth, Texas, wherein Affirmative and GSA reached an understanding of the financial framework and structure of the prospective deal. At the time, no written commission agreement had been signed, and although Property One understood Affirmative would soon agree to one, it never happened. Affirmative had given Property One assurances over the leasing commissions whenever Affirmative hired another broker, but then told Property One its services were no longer needed.

On December 14, 2009, USAgencies and GSA signed a new lease ("the second FEMA lease") for the Renaissance Park building which substantially tracked the terms Callicott helped broker at the Forth Worth meeting on October 8, 2008. Property One

thereafter sent invoices totaling over $900,000 in commissions to defendants in September 2010, (*see* Commission Invoices, Doc. 1-3), but has received no payment.

## II. Standard of Review

A. <u>Motion to Dismiss Standard</u>

Pursuant to Fed. Rule Civ. P. 12(b)(6), on a motion to dismiss for failure to state a claim, the Court accepts all well-pleaded, non-conclusory facts in the complaint as true. *Ashcroft v. Iqbal*, -- U.S. --, 129 S.Ct. 1937, 1949 (2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A] formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A complaint that pleads facts merely consistent with a defendant's liability "stops short of the line between possibility and plausibility." *Id.* at 557. When well-pleaded factual allegations populate the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 129 S.Ct. at 1950. Courts may consider not only the complaint itself, but also documents attached to the complaint or documents incorporated into the complaint by reference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The facts in the complaint are viewed collectively, not scrutinized in strict isolation. *Id.*

B. <u>Summary Judgment Standard</u>

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact." Fed. Rule Civ. P. 56(a). The party seeking summary judgment carries the burden of demonstrating that there is an absence of

3

evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the burden at trial rests on the non-moving party, the moving party need only demonstrate that the record lacks sufficient evidentiary support for the non-moving party's case. *Id.* The moving party may do this by showing that the evidence is insufficient to prove the existence of one or more essential elements of the non-moving party's case. *Id.* A party must support its summary judgment position by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. Rule Civ. P. 56(c)(1).

Although the Court considers evidence in a light most favorable to the non-moving party, the non-moving party must show that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). Conclusory allegations and unsubstantiated assertions will not satisfy the non-moving party's burden. *Grimes v. Tex. Dep't of Mental Health*, 102 F.3d 137, 139-40 (5th Cir. 1996). Similarly, "[u]nsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991), *cert. denied*, 507 U.S. 1051. If, once the non-moving party has been given the opportunity to raise a genuine fact issue, no reasonable juror could find for the non-moving party, summary judgment will be granted for the moving party. *Celotex*, 477 U.S. at 322.

### III. Discussion

Because both a motion to dismiss and a motion for summary judgment are pending before the Court, the Court must first address the sufficiency of the claims as

contained in the pleadings. The surviving claims, if any, will then be treated under the standard for summary judgment.

    A. Motion to Dismiss

        *1. Procurement Claim for Unpaid Real Estate Brokerage Commission*

Plaintiff's main allegation concerns unpaid real estate brokerage commissions it alleges it is entitled to based on services rendered in helping defendants procure a suitable tenant to lease the Renaissance Park building. While USAgencies does not move to dismiss this allegation, Affirmative contends the factual allegations do not support a claim against it.

Affirmative argues that because USAgenices was the owner of the building and the negotiating party which benefitted from Property One's efforts, Affirmative cannot be liable for any potential brokerage commission. Plaintiff clearly alleges that USAgencies, not Affirmative, owns the building at issue. (Complaint, Doc. 1-4, ¶ 5). Moreover, plaintiff does not respond to defendants' arguments for dismissing the claim against Affirmative, instead merely asserting the general basis upon which plaintiff should be paid. The procurement claim for unpaid brokerage commissions against Affirmative must therefore be dismissed.[2]

        *2. Unjust Enrichment Claim*

There are five prerequisites to the unjust enrichment claim: (1) there must be an enrichment of the defendant; (2) there must be an impoverishment of the plaintiff; (3) there must be a connection between the enrichment and resulting impoverishment; (4)

---

[2] While defendants correctly note that plaintiff essentially ignores the corporate separateness of USAgencies and Affirmative in its pleading, (Motion to Dismiss, Doc. 5-1, p. 9), the only time defendants substantively raise the matter is in regard to this claim (*see id.*, pp. 11-12). The Court therefore does not separately analyze the claims against each defendant in other parts of this ruling.

there must be an absence of justification or cause for the enrichment and impoverishment; and (5) the action will only be allowed when there is no other remedy at law, *i.e.,* the action is subsidiary or corrective in nature. *Minyard v. Curtis Products, Inc.*, 205 So.2d 422, 432 (La. 1967) (codified in La. C.C. art. 2298). The final requirement has been interpreted strictly—even pleading in the alternative can be grounds for dismissal if a plaintiff unambiguously pleads a delictual action. *Walters v. MedSouth Record Mgmt., L.L.C.*, 38 So.3d 245, 246 (La. 2010) (holding that negligence law provided unjust enrichment plaintiff with another legal remedy, even if the tort action had prescribed). The *Walters* Court found only that the plaintiff in that case should have brought a tort action before the prescriptive period had run. 38 So.3d 245, 246-47. Since the district court in that case had issued a final judgment on the prescription of any tort claim, plaintiff could not amend his petition to allege unjust enrichment arising from the same facts as the prescribed tort claims. *Id.*

Defendants assert that *Walters* compels dismissal of the unjust enrichment claim. Plaintiff, citing no law, simply informs the Court that "there is no need or rush" to dismiss the unjust enrichment claims, desiring that they "be maintained until after sufficient discovery has been had in this case." (Memo. in Opp., Doc. 11, p. 12). While the Court would prefer a proper legal argument from plaintiff, as opposed to a one paragraph plea for discovery, Fed. Rule Civ. P. 8 provides for alternative pleading even if the alternative claims are pled inconsistently with other claims. The liberality of the Federal Rules in allowing for alternative pleading, combined with the narrowness of the *Walters* holding, which only barred unjust enrichment claims from being plead alongside *tort* claims, as opposed to unpaid commission claims, permits this claim to survive dismissal.

6

### 3. Detrimental Reliance Claim

A claim for detrimental reliance arises under La. C.C. art. 1967, which states, "A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." There are three elements: (1) a representation by conduct or work; (2) justifiable reliance thereon; and (3) a change in position to one's detriment because of the reliance. *Miller v. Miller*, 817 So.2d 1166, 1171 (La. App. 2d Cir. 2002). Since detrimental reliance is an equitable remedy, it is disfavored and applied sparingly because it bars the normal assertion of rights otherwise present. *Id.*

As already discussed, defendants do not contest whether plaintiff has stated a claim for payment of real estate commissions. Defendants argue that detrimental reliance, like unjust enrichment, cannot be pled in an action where a legal remedy is available. However, defendants do not even have a case like *Walters* which comes close to saying that even an alternatively-pled complaint cannot be sustained. At this point in the litigation, it has not been established that plaintiff has (or had) a remedy at law. Unless and until the Court determines that plaintiff could have (or has) pursued a particular legal avenue which encompasses the same facts allegedly giving rise to the equitable remedies sought, it would be premature to say plaintiff's mere allegation of a non-equitable claim would *ipso facto* bar an alternatively-pled equitable cause of action. Such a holding would stand at odds with Rule 8.

### 4. Conspiracy and General Tort Claims

Plaintiff's complaint makes certain intimations of complicity between USAgencies and Affirmative such that defendants felt obligated to brief a conspiracy claim. (*See*

7

Case 3:11-cv-00453-JJB -SCR   Document 21   11/15/11   Page 7 of 16

Complaint, Doc. 1-4, at ¶ 5 (alleging Affirmative controlled USAgencies); ¶ 9 (alleging Affirmative controlled USAgencies and made USAgencies complicit in Affirmative's actions)). While plaintiff appears to refer to the defendants somewhat interchangeably throughout the petition, the Court does not detect a concrete allegation of conspiracy. Moreover, even if present, conclusory allegations of conspiracy cannot survive a motion to dismiss. *Arsenaux v. Roberts*, 726 F.2d 1022, 1023-24 (5th Cir. 1982). Conspiracy claims, cognizable under Louisiana law through La. C.C. art. 2324, require an allegation of conspiracy to commit an underlying intentional tort. *Louisiana v. Guidry*, 489 F.3d 692, 706-07 (5th Cir. 2007) (recognizing that even after revision, La. C.C. art. 2324 applies only to conspiracies involving intentionally tortious conduct). Plaintiff clearly has not done so here. No intentional tort has been pled, and thus any conspiracy claim must be dismissed.

Like the conspiracy claim, the Court detects no concrete allegation of conduct sounding in tort. This conclusion appears well-founded. Plaintiff had a good reason to avoid pleading a tort because, as discussed above, *Walters* forbids pleading an unjust enrichment claim alongside a tort. *See Walters*, 38 So.3d 245.

B. Summary Judgment

For purposes of this motion, new facts that go beyond the allegations in the complaint have been presented. These undisputed facts add to and expand upon the facts alleged in Property One's complaint.

1. *New Summary Judgment Facts*

The initial FEMA lease was signed on September 1, 2005 between GSA and a prior owner of the Renaissance Park building. (Initial FEMA Lease, Doc. 6-2, pp. 3-4).

The initial FEMA lease was scheduled to terminate on August 28, 2008. (*Id.*, p. 4, ¶ B). USAgencies later obtained the building on November 10, 2005, (Declaration of Kenneth Champagne, Doc. 6-2, p. 1, ¶ 2), and thereafter assumed the commission payments to Property One via assignment from the previous owners who had hired Property One (*Id.*, ¶ 3; Assigned Commission Agreement, Doc. 6-2, pp. 18-20). FEMA, USAgencies, and Property One all signed the Assignment and Assumption of Commission Agreement (hereinafter, "the Assigned Commission Agreement") on November 10, 2005. (Assigned Commission Assignment, Doc. 6-2, pp. 18-20). On January 28, 2008, USAgencies engaged Latter & Blum in an exclusive listing agreement for the Renaissance Park building and also engaged them as its exclusive agent in negotiations with GSA for a new lease of the property. (Latter & Blum Listing Contract, Doc. 6-2, pp. 38-39). Property One and USAgencies then entered into a release of the commission agreement on January 30, 2008. (Release, Doc. 6-2, p. 40). The precise meaning and effect of the Assigned Commission Agreement and its subsequent release are hotly disputed, as will be explored below.

    One matter complicates this search for the meaning of those two documents. On August 11, 2008, USAgencies and GSA entered into a one year extension of the initial FEMA lease, extending the termination date from August 28, 2008 to August 28, 2009. (First Extension of Initial FEMA Lease, Doc. 6-3, p. 3). On August 31, 2009, they entered into another supplemental lease extension which deferred the termination date from August 28, 2009 to November 30, 2009. (Second Extension of Initial FEMA Lease, Doc. 6-3, p. 5). Ultimately, GSA and USAgencies entered into a new long-term lease on December 14, 2009. (Second FEMA Lease, Doc. 6-3, pp. 6-10).

*2. Did the Commission Agreement and Subsequent Release Terminate Property One's Right to Recover Commissions from Defendants?*

In order to survive defendants' motion for summary judgment, the Assigned Commission Agreement of November 10, 2005 and the subsequent release of that agreement dated January 30, 2008 must be interpreted. The Assigned Commission Agreement was entered into between Renaissance Park, LLC (the previous owners of the Renaissance Park building), USAgencies, and Property One. (Doc. 6-2, pp. 18-20). In that agreement, Renaissance Park, LLC assigned all of its liability for the commissions regarding the FEMA lease owed to Property One. The key passage of the Assigned Commission Agreement reads as follows:

> The maximum period of time that the FEMA Lease may be effective is through August 28, 2008. Thereafter, or earlier if lessee terminates the FEMA Lease, no Broker's commissions are due under the Commission Agreement. … Once the FEMA Lease is terminated by Tenant or at its expiration, Assignee shall have no further obligation for payment of any leasing commissions to Broker in the event Assignee leases the Property to a new tenant.

(Assigned Commission Agreement, Doc. 6-2, p. 18, § 1). The agreement also contains a clause stating that the "Agreement may not be amended, modified or terminated except by an instrument, in writing, executed by the parties hereto." (*Id.*, p. 19, § 5).

The agreement explicitly acknowledges the definite termination date of the initial FEMA lease, after which no commission would be owed to Property One for the initial FEMA lease (though perhaps a commission might be owing for another lease signed by FEMA).

In January 2008, as the termination date of August 28, 2008 for the initial FEMA lease began to approach, Property One and USAgencies entered into a "release" of the Assigned Commission Agreement. Because the release is relatively short and its terms

are hotly disputed, the Court reproduces the substantive text of the agreement in full. It reads as follows:

> RELEASE OF ASSIGNMENT AND ASSUMPTION OF COMMISSION AGREEMENT
>
> For ten dollars ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, and *upon execution of <u>a new lease</u> between USAgencies, L.L.C. (Owner) and General Services Administration (GSA)*, hereinafter referred to as Lessee (Lessee) for the property located at 1500 Main Street, Baton Rouge, Louisiana, *Property One, Inc. shall release Owner from any further obligations for lease commissions as outlined in the Assignment and Assumption of Commission Agreement (Agreement) dated November 10, 2005* between USAgencies, L.L.C. and Property One, Inc.
>
> Said Agreement relates to that certain FEMA Lease #DR-1603-LA-KATRINA-JFO#1 dated September 1, 2005 between Renaissance Park, LLC as Lessor and the United States of America known as Lessee ("the FEMA Lease").
>
> *Latter & Blum Property Management, Inc. and Property One, Inc. shall have a separate Commission Agreement in place related to <u>new lease</u> to be executed by Owner and Lessee.*

(Release, Doc. 6-2, p. 40) (emphasis added). The plain text of the release mandates that Property One release USAgencies from any claims for brokerage commissions that might arise from the Commission Agreement upon execution of a new lease between USAgencies and the GSA. It also directs Property One to look to Latter & Blum for any brokerage commissions it might be owed for the new lease.

But what, exactly, is meant by "new lease"? At first blush, both USAgencies and Property One proffer reasonable interpretations of "new lease" based on an isolated, plain reading. USAgencies argues new lease refers to a new, long-term lease that was not derivative of the initial FEMA lease, and it asserts the December 14, 2009 lease was the only lease that qualifies. Property One argues that new lease refers to the next

11

lease term agreed to by USAgencies and the GSA, which would mean the extension of the initial FEMA lease entered into on August 11, 2008. Looking solely at the four corners of the release, it might be said that the release is ambiguous on what "new lease" means.

But by delving into the details of the Assigned Commission Agreement, which the release expressly incorporates, the Court finds that the term "new lease" refers to any lease that extends the termination date of the initial FEMA lease. As both the release and the Assigned Commission Agreement confirm, the only commissions owed to Property One arose from the initial FEMA lease of November 10, 2005. The plain text of the initial FEMA lease indicates a termination date of August 28, 2008. The Assigned Commission Agreement confirms this by specifying that "[t]he maximum period of time that the FEMA lease may be effective is through August 28, 2008." Thus, "releasing" the Assigned Commission Agreement only waived Property One's right to the commissions owed it through the end of the initial FEMA lease. Viewed in light of that knowledge, an "execution of a new lease" as used in the release necessarily covers any lease which extends the termination date past August 28, 2008.[3] The parties apparently contemplated the next lease signed by USAgencies and GSA to be such a lease. The release speaks of "a new lease" in singular rather than plural form, and no words of inclusion or expansion (*e.g.,* "any subsequent lease") were added. Such a "new lease" thus applies to the first extension of the initial FEMA lease entered into on August 11, 2008, because it extended the termination date of the initial FEMA lease

---

[3] Defendants themselves admit that "new" can be "employed in contrasting the date … of one thing with the corresponding attributes of another thing." (Reply Brief, Doc. 15, p. 8 (quoting Black's Law Dictionary (sixth ed.))). The term "new lease" in the release did indeed "contrast the date" of termination of the initial FEMA lease by providing that a lease extending the termination date would, in fact, constitute a new lease.

past August 28, 2008.  The Court must therefore disagree with USAgencies' interpretation of the release, rendering summary judgment inappropriate.

While the Court finds the release unambiguous and clear on its face after referring to the incorporated Assigned Commission Agreement, it cannot escape notice that several practical considerations bolster this conclusion.[4]  As Property One persuasively argues, at the time the release was entered into, USAgencies was concerned that any extension of the initial FEMA lease—whether characterized as an extension of an existing lease, a supplemental lease, a new lease, or otherwise—might require it to pay additional compensation to Property One.  USAgencies understandably sought to foreclose that possibility by both engaging Latter & Blum as its sole agent for any potential negotiations with GSA and also obtaining Property One's consent to the release of any claim to commissions owing from such negotiation.  Moreover, the parties at the time of the release did not contemplate the subsequent work performed by Property One, culminating in the October 8, 2008 meeting in Fort Worth.  At or around the time the release was signed, Latter & Blum had assumed the lead role in negotiations with the GSA on behalf of USAgencies.

USAgencies argues that Property One's references in its complaint to the second, long-term FEMA lease of December 14, 2009 as the "new lease" constitutes a judicial admission that the release refers to the December 14, 2009 lease.  This argument strains credulity.  Property One does not mention the Assigned Commission Agreement or the release in its complaint.  It spoke of the December 14, 2009 lease as a "new lease" only to create a dichotomy with the initial FEMA lease of 2005.  The

---

[4] Because the Court does not rely on the declarations submitted by Property One (Docs. 12-2, 12-3) in interpreting the release, defendants' motion to strike declarations (Doc. 16) is denied as moot.

13

mentions of "new lease" in the complaint do not constitute admissions concerning the construction of the release terms.

### 3. Unpaid Brokerage Commission Claim against USAgencies

A claim for unpaid brokerage commissions is a contract claim recognized by Louisiana courts. A realtor, even without a written listing contract, may be entitled to a commission if there is sufficient proof of a verbal or written contract of agency between the parties. *Sleet v. Williams*, 291 So.2d 495, 497 (La. App. 3d Cir. 1974). The contract may be express "or one that can definitely be implied from the relations existing between them." *Rosenthal v. Cangelosi*, 164 So. 502, 503 (La. App. 1st Cir. 1935). The realtor is entitled to the commission even after termination of the agency contract if the realtor was the procuring cause of the sale or lease. *Cramer v. Guercio*, 331 So.2d 550, 552 (La. App. 1st Cir. 1976). "[A] real estate broker is considered the procuring cause of a sale if he brings the parties together, even though the parties conduct final negotiations themselves and even though the broker does not have a listing or an exclusive agency agreement." *Lee Eyster and Associates, Inc. v. Favor*, 504 So.2d 580, 581 (La. App. 4th Cir. 1987). Stated another way, to be considered a procuring cause, a broker must set "in motion a series of events which, *without break in their continuity*, results in an ultimate agreement between the principal and prospective contracting party. *Katz v. Young Men's Christian Ass'n of Greater New Orleans*, 466 So.2d 603, 605 (La. App. 5th Cir. 1985) (emphasis in original). Procuring cause is not established by "the mere fact that a sale may have been in some way aided by the previous efforts of the broker." *Cramer*, 331 So.2d at 552. Procuring cause is a

14

question of fact.  *Katz*, 466 So.2d at 607.  This claim is subject to a three year liberative prescription period under La. C.C. art. 3494(1).

Defendants' sole argument in their summary judgment motion concerned the interpretation of the release.  Because the Court has ruled adversely to defendants regarding the interpretation of the Assigned Commission Agreement and the subsequent release, genuine issues of material fact remain.  Specifically, the record has not been developed regarding any potential contract between Property One and defendants.  After discovery, the parties may present additional arguments in favor of their positions in summary judgment motions or at trial.

*4. Unjust Enrichment and Detrimental Reliance Claims*

Similarly, because the existence of a contractual remedy remains unclear, the Court cannot at this time dismiss the equitable claims presented.  If either party presents sufficient evidence regarding Property One's remedy at law, the Court will then entertain dismissal.  Until such time occurs, though, it would be premature to foreclose a potential avenue of recovery now, only to later discover that no remedy at law ever in fact existed in the first place.  Defendants' argument that plaintiff unjustifiably relied on the alleged representations for commissions paid despite the existence of the release is untenable in light of the Court's finding that the release did not in fact apply to the December 14, 2009 lease.

15

## IV. CONCLUSION; ORDER

Accordingly, the Court GRANTS in part and DENIES in part defendants' motion to dismiss (Doc. 5).

The Court DENIES defendants' motion for summary judgment (Doc. 6).

The Court DENIES as MOOT defendants' motion to strike declarations (Doc. 16).

Signed in Baton Rouge, Louisiana, on November 15, 2011.

_____
**JAMES J. BRADY, DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**